Brad M. Johnston, Esq.
Nevada Bar No. 8515
bjohnston@hollandhart.com
Tamara Jankovic, Esq.
Nevada Bar No. 9840
tjankovic@hollandhart.com
Holland & Hart LLP.
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Telephone: (775) 327-3000
Facsimile: (775) 786-6179

Emily M. Yinger, Esq. *(Admitted Pro Hac Vice)*
N. Thomas Connally, Esq. *(Admitted Pro Hac Vice)*
Michael M. Smith, Esq. *(Admitted Pro Hac Vice)*
HOGAN & HARTSON LLP
Park Place II
7930 Jones Branch Drive
McLean, Virginia 22102-3302
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
ntconnally@hhlaw.com
mmsmith@hhlaw.com

Attorneys for Defendants.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

KEVIN WINDISCH, M.D., on behalf of himself and all others similarly situated,

      Plaintiffs,

v.

HOMETOWN HEALTH PLAN, INC., HOMETOWN HEALTH PARTNERS, BENEFIT ADMINISTRATORS, INC., HOMETOWN HEALTH PROVIDERS INSURANCE COMPANY, INC., AND RENOWN HEALTH,

      Defendants.

Case No.: 3:08-CV-00664-BES-RAM

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6)**

1

**TABLE OF CONTENTS**

2
<u>Page No.:</u>

3    TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

4    I.    Dr. Windisch's Claims Are Preempted by ERISA. . . . . . . . . . . . . . . . . . . . . . . . . . .1

5          A.    A Provider's Claims Are Preempted If They Relate to an ERISA Plan . . . . . . . .1

6          B.    Dr. Windisch's Claims Are Preempted Because They Relate
7                to ERISA Plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

8                1.    The Court Cannot Determine What Services Are Covered
                        Under the Provider Agreement Without Interpreting
9                       an ERISA Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10               2.    Adjudication of Dr. Windisch's Claims Will Encroach On ERISA-
                        Regulated Relationships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
11
12   II.   Dr. Windisch Has Failed To Allege A Claim For Consumer
           Fraud Under NRS 41.600. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13         A.    Dr. Windisch Has Failed to Allege An Act of Consumer Fraud . . . . . . . . . . . . 13

14         B.    NRS 598.0915(15) Should Be Interpreted Pursuant to the Whole Act Rule. . . . .16

15         C.    Dr. Windisch Was Not Damaged As a Result of His Reliance
                 on the Defendants' Purported Act of Consumer Fraud. . . . . . . . . . . . . . . . . . . . .19
16
17   III.  Because Dr. Windisch's  Consumer Fraud Claim Sounds in Fraud,
           It Must Be Plead With Particularity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18   IV.   Dr. Windisch Fails to State Any Distinct Allegations Against Renown. . . . . . . . . . . . 23

19   V.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

20   CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

21

22

23

24

25

26

27

28

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1

<div align="center"><b>TABLE OF AUTHORITIES</b></div>

2

<div align="right"><u>Page No.:</u></div>

3
*Ambulatory Infusion Therapy Specialists v. Aetna Life and Health Ins. Co.*,
      2007 WL 320974, (S.D. Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

4
*Baer v. Amos J. Walker*,
      452 P.2d 916 (Nev. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

5

6
*Bell Atl. Corp. v. Twombly*,
      550 U.S. 544, __, 127 S.Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7
*Blue Cross of Cal. v. Anesthesia Care Assocs. Med Group*,
      187 F.3d 1045 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, n3, 9

8

9
*Bonanza Hotel Gift Shop v. Bonanza No. 2*,
      596 P. 2d 227 (Nev. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10
*Dzyuba v. Mukasey*,
      540 F.3d 955 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

11

12
*Felix v. Lucent Technologies*,
      387 F.3d 1146 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n2

13
*Fresno Community Hospital & Medical Center v. Souza*,
      2007 WL 2120272 (E.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 11

14

15
*George v. Morton*,
      2007 WL 680789 (D. Nev. March 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 23

16
*Hospice of Metro Denver v. Group Health Ins. of Okla.*,
      944 F.2d 752 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17

18
*In Home Health v. Prudential Ins. Co. of Am.*,
      101 F.3d 600 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

19
*In re Managed Care Litig.*,
      135 F.Supp.2d 1253 (S.D. Fla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 10, 11

20

21
*In re Managed Care Litig.*,
      298 F.Supp.2d 1259 (S.D. Fla. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

22
*Ingersoll-Rand Co. v. McClendon*,
      498 U.S. 133 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 5

23

24
*Klay v. Humana*,
      382 F.3d 1241 (11th Cir. 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

25
*Kokoszka v. Belford*,
      417 U.S. 642 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

26

27
*Lewis v. Bayer Corp.*,
      No. C 03-04402 JSW, 2004 WL 2196540 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . .13

28

<div style="font-size:small; transform: rotate(-90deg);">HOLLAND & HART LLP<br>5441 KIETZKE LANE<br>SECOND FLOOR<br>RENO, NV 89511</div>

<div align="center">ii</div>

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

*Lockerby v. Sierra,*
    535 F.3d 1038 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Lordman Enters. v. Equicor,*
    32 F.3d 1529 (11th Cir 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4, 5, n2, 10

*McGlinchy v. Shell Chem. Co.,*
    845 F.2d 802 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*McMahon v. Digital Equip. Corp.,*
    162 F.3d 28 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

*Memorial Hospital System v. Northbrook Life Ins. Co.,*
    904 F.2d 236 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 5

*Miller v. Monumental Life Ins. Co.,*
    502 F.3d 1245 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

*Moeller v. Qualex,*
    458 F.Supp.2d 1069 (C.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . n2

*Picus v. Wal-Mart Stores, Inc.,*
    ___ F. Supp. 2d ___, 2009 WL 667419 (D. Nev. March 16, 2009) . . . . . . . 13, 14, 16, 20

*The Meadows v. Employers Health Ins.,*
    47 F.3d 1006 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3, 9

*Variety Children's Hosp. v. Blue Cross/Blue Shield of Fla.,*
    942 F. Supp. 562 (S.D. Fla. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

## TABLE OF STATUTES AND RULES

                                                                    <u>Page No.:</u>

29 U.S.C. § 1132(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n1

29 U.S.C. § 1144(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .n1

Fed. R. Civ. P. 5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

NRS 41.600. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 16

NRS 41.600(2)(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

NRS 598.0915. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17

NRS 598.0915 (15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 17, 18, 23

NRS 598.0915 to 598.0925. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

NRS 598.0915(1) – (14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

1   NRS 598.0923(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

2   NRS 598.0923(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

3   NRS 598.0923(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

4   NRS 598.0925 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

5   **TABLE OF OTHER AUTHORITIES**

6                                                                              <u>Page No.:</u>

7   Assembly Bills 300 and 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8   Hearings on A.B. 301 Before the Committee on Commerce, 57th Session, 228 (1973). . . . . . . .19

9   2A Sutherland, § 47.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4524490_1.DOC

26

27

28

iv

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    Defendants Hometown Health Plan, Inc., Hometown Health Partners, Benefit

2    Administrators, Inc., Hometown Health Providers Insurance Company, Inc., and Renown Health

3    (collectively, "Defendants"), by and through their undersigned counsel, Holland & Hart LLP and

4    Hogan & Hartson LLP, hereby submit their reply in support of their Motion to Dismiss.

5    **I.    Dr. Windisch's Claims Are Preempted by ERISA.**

6    Relying on inapposite case law and ignoring the plain language of his own Provider

7    Agreement, Dr. Windisch argues that his claims against the Defendants are not preempted as a

8    matter of law, and further contends that, even if his claims could be preempted, they are not

9    because they do not require interpretation of any ERISA plan. Dr. Windisch is incorrect because

10    a provider's claims against an insurer are preempted if their adjudication requires interpretation

11    of an ERISA plan. Here, Dr. Windisch's claims necessarily depend on the threshold

12    determination that the services for which he seeks payment were "covered services" under the

13    applicable ERISA plans. Unless the services provided were "covered services" as defined in the

14    applicable ERISA plans, Dr. Windisch has no right to payment. As a result, the Court cannot

15    determine whether Dr. Windisch has a valid claim for payment without first determining whether

16    the service was covered under the applicable ERISA plan, and thereby interpreting the scope of

17    coverage under that ERISA plan. It is precisely this type of interpretation of an ERISA plan in

18    state-law claim litigation that is preempted under Section 514 of the ERISA statute. [1]/

19    **A.    A Provider's Claims Are Preempted If They Relate to an ERISA Plan.**

20    Dr. Windisch contends that a medical provider's state-law claims against an insurer can

21    never be preempted if the provider's claims are based on a contract between the provider and the

22    insurer. Opp'n. at 4-5. It is undisputed, however, that if the adjudication of a state-law claim

23    requires interpretation of an ERISA plan, then the claim "relates" to the ERISA plan and is

24    expressly preempted by ERISA Section 514. *McMahon v. Digital Equip. Corp.*, 162 F.3d 28, 38

25

26    [1]/    The express preemption provision (also known as Section 514) is 29 U.S.C. § 1144(a), and expressly
preempts any state law that conflicts with the ERISA statute; the complete preemption provision (also known as
27    Section 502) is 29 U.S.C. § 1132(a), and gives federal courts exclusive jurisdiction over any state-law claim that
could have been brought as an ERISA claim. The difference between these two types of ERISA preemption is
28    addressed further in footnote 3, *infra.*

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1   (1st Cir. 1998) ("a state law cause of action is expressly preempted by ERISA where a plaintiff,

2   in order to prevail, must prove the existence of, or specific terms of, an ERISA plan") (citing

3   *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990)).  Indeed, while Dr. Windisch cites

4   numerous cases that he believes support his argument, these cases actually stand for the

5   unchallenged proposition that a provider's state-law claims are not preempted *if* they can be

6   adjudicated *without* interpreting an ERISA plan.

7        Almost all of the cases Dr. Windisch cites arose from instances in which insurers told

8   providers that an ERISA plan would cover specific services rendered to specific individuals, only

9   to later refuse to make payment to the providers because the services were not, in fact, covered.

10  In those cases, the providers were seeking payment based on the insurer's misrepresentation that

11  services provided were covered and that the providers would be paid.  The providers' claims did

12  not depend on whether or not the services were, in fact, covered, but rather were based on their

13  reliance on the insurer's misrepresentation that the services were covered.  Indeed, in many of

14  those cases it was undisputed that the services were not, in fact, covered.  In such circumstances,

15  courts have determined that a provider's claims are not preempted because the court does not

16  need to interpret an ERISA plan and determine the scope and level of coverage thereunder in

17  order to adjudicate the providers' claims – the claims are based on the insurer's

18  *misrepresentation* of the ERISA plan's terms, not the actual *terms* of the ERISA plan itself.  In

19  short, the providers could prevail on the their state-law claims without having the court rule on

20  the scope of coverage under an ERISA plan.

21        An example of such a case is *The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th

22  Cir. 1995).  In *The Meadows*, an individual who believed she had coverage through an ERISA

23  plan sought treatment from a provider.  Before rendering services, the provider telephoned the

24  ERISA plan's insurer and confirmed coverage for the services.  When the provider sought

25  reimbursement, the insurer denied the claim because the individual's coverage under the ERISA

26  plan had lapsed prior to the date of service.  The provider sued asserting state-law claims for

27  negligent misrepresentation, estoppel, and breach of contract based on the insurer's confirmation

28  of coverage.  The Ninth Circuit held that the claims were not preempted because it was

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    undisputed that, contrary to the insurer's previous misrepresentations, the individual was not

2    covered under any ERISA plan at the time service was rendered, and thus, the claims did not

3    "relate" to any ERISA plan. *Id.* at 1009 ("We hold that…the independent state law claims of

4    [the provider] lie outside the bounds of the ERISA 'relates to' standard because neither [the

5    provider] nor [the individual] had any existing ties to the ERISA plan [on the date of service].").

6      In *The Meadows* and other similar cases cited by Dr. Windisch, adjudication of the

7    providers' state-law claims did not require interpretation of any ERISA plans because the state-

8    law claims were based on *misrepresentations* about the terms of ERISA plans made by insurers

9    to providers – not the actual terms of any ERISA plans. *See Mem'l Hosp. Sys. v. Northbrook*

10   *Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990) (when insurer falsely represents coverage to

11   provider, provider's state-law claims based on the misrepresentation are not preempted

12   "precisely because there is no ERISA coverage"); *Lordman Enters. v. Equicor*, 32 F.3d 1529

13   (11th Cir 1994) (provider's state-law claim against insurer for negligent misrepresentation of

14   coverage not preempted); *In Home Health v. Prudential Ins. Co. of Am.*, 101 F.3d 600 (8th Cir.

15   1996) (same); *Hospice of Metro Denver v. Group Health Ins. of Okla.*, 944 F.2d 752 (10th Cir.

16   1991) (provider's state-law promissory estoppel claim not preempted); and *Variety Children's*

17   *Hosp. v. Blue Cross/Blue Shield of Fla.*, 942 F. Supp. 562 (S.D. Fla. 1996) (same).

18     By contrast, Dr. Windisch alleges in this case that the Defendants refused to reimburse

19   him for services he provided to Enrollees, and that the refusal was improper because the services

20   were "Covered Services" under the terms of his Provider Agreement. Unlike the cases discussed

21   above, Dr. Windisch's claims do not arise from allegations that the Defendants made a

22   misrepresentation to Dr. Windisch that the specific services to be provided to specific patients

23   were covered and would be paid only to later refuse to make payment because of non-coverage.

24   Instead, Dr. Windisch claims breach of his Provider Agreement – that the Defendants have failed

25   to pay for services they are obliged to pay for under the Provider Agreement. In order for Dr.

26   Windisch to have a right to payment for a particular service under the Provider Agreement, the

27   service provided has to be a covered service under the applicable ERISA plan. *See* Mot. to

28   Dismiss at 7-9. Thus, unlike in *The Meadows* and similar cases, this Court would be required to

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1  interpret and determine the scope of coverage under one or more ERISA plans to adjudicate Dr.

2  Windisch's claims.  *See Ambulatory Infusion Therapy Specialists v. Aetna Life and Health Ins.*

3  *Co.*, No. H-05-4389, 2007 WL 320974, at *10 (S.D. Tex. 2007) (distinguishing cases in which

4  the ERISA insurer misrepresented coverage to the provider before service was rendered from

5  cases in which the ERISA insurer refused to reimburse the provider after services were rendered

6  because the services were not covered, and holding that resolution of the latter type of claim

7  requires an inquiry into the ERISA plan).  As a result, Dr. Windisch's claims are preempted.

8      The inapplicability here of the decisions in the misrepresentation cases is further

9  exemplified by examining the policy reasons discussed as part of the dicta in those opinions.  For

10  example, as Dr. Windisch notes, in *Lordman*, the court stated that preemption of the provider's

11  claims in that case would not serve ERISA's purpose, which is the protection of the interests of

12  ERISA plan participants.  The court's reasoning in *Lordman*, however, is limited to situations

13  involving allegations of misrepresentations of coverage by insurers:

14      The "commercial realities" of the health care industry require that health care
    providers be able to rely on insurers' representations as to coverage.  If ERISA
15      preempts their potential causes of action for misrepresentations, health care
    providers can no longer rely as freely and must either deny care or raise fees to
16      protect themselves against the risk of noncoverage.  In that event, the employees
    whom Congress sought to protect would find medical treatment more difficult to
17      obtain.

18  *Lordman*, 32 F.3d at 1533 (internal quotations and citations omitted).  These concerns are not

19  implicated in this case since the Defendants did not misrepresent coverage to Dr. Windisch.  To

20  the contrary, allowing Dr. Windisch's state-law claims to proceed would undermine Congress's

21  intent of ensuring that plans and plan sponsors would be subject to a uniform body of benefits

22  law by applying state law to the interpretation of terms of an ERISA plan.

23      For example, Dr. Windisch alleges that when "he sought compensation for specific, age-

24  normed developmental testing he had performed on a patient, Defendants improperly determined

25  that the developmental tests were 'incidental' to the child's well visit…and unjustifiably denied

26  reimbursement for services."  *Compl.* at ¶ 43.  Whether Defendants' denial of reimbursement

27  was "justified" depends entirely on whether the test was covered under the applicable ERISA

28  plan.  *See* Mot. to Dismiss at 7-9.  If the Court were to apply Nevada contract law and determine

4

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    that the test was covered under Dr. Windisch's Provider Agreement, it would mean that the test

2    was covered under the applicable ERISA plan, as well.  Having the scope of coverage under an

3    ERISA plan thus determined (and, in this example, expanded) in litigation over state-law claims

4    is precisely what Congress sought to avoid.  *See Miller v. Monumental Life Ins. Co.*, 502 F.3d

5    1245, 1248-49 (10th Cir. 2007) (district court erred in interpreting ERISA plan according to state

6    law because ERISA preempts state rules of insurance contract interpretation).

7          Similarly inapplicable is the *Lordman* court's discussion of whether providers are parties

8    to the ERISA "bargain."  The *Lordman* court's discussion of the ERISA bargain was borrowed

9    from the *Memorial Hospital* opinion.  *See Lordman*, 32 F.3d at 1533.  In its discussion of the

10   ERISA bargain, the court in *Memorial Hospital* reasoned that Congress did not intend to preempt

11   a provider's claims "when a cause of action based on [the insurer's actions] *would not relate to*

12   *the terms or conditions of the [ERISA] plan*."  *Mem'l Hosp.*, 904 F.2d at 249 (emphasis added).

13   Thus, the court itself limited its discussion to circumstances that do not require interpretation of

14   an ERISA plan. [2]/

15         ERISA "[s]ection 514(a) was intended to ensure that plans and plan sponsors would be

16   subject to a uniform body of benefits law; the goal was to minimize the administrative and

17   financial burden of complying with conflicting directives among States or between States and the

18   Federal Government.  Otherwise, the inefficiencies created could work to the detriment of plan

19   beneficiaries."  *Ingersoll-Rand*, 498 U.S. at 484.  Allowing Dr. Windisch's state-law claims to

20

---

21   [2]/    Additionally, the *Lordman* court expressed concern that the providers in that particular case had
     detrimentally relied on the insurers' misrepresentations of coverage, yet had no remedy under ERISA for those
22   misrepresentations.  That concern is not implicated here because Dr. Windisch's claims do not arise from
     misrepresentations of coverage made by Defendants to Dr. Windisch.  Instead, Dr. Windisch's claims arise from
23   Defendants' performance under Dr. Windisch's Provider Agreement – an agreement that expressly incorporates the
     terms of numerous ERISA plans and explicitly entitles Dr. Windisch to obtain copies of the "relevant portions" of
24   those plans.  *See* Provider Agreement at Art. I.C. (defining "Covered Services" under the Provider Agreement as
     those services covered under the applicable plan, and stating that the relevant portions of the plans "shall be made
25   available" to Dr. Windisch).  Moreover, the lack of an available ERISA remedy does not alter the express
     preemption analysis.  *See, e.g., Moeller v. Qualex*, 458 F.Supp.2d 1069, 1075 (C.D. Cal. 2006) ("[T]he [c]ourt is
26   bound by the large body of law that makes it clear that ERISA § 514 can preempt state law claims even where, as
     here, ERISA provides no remedy for [p]laintiff."); *Felix v. Lucent Technologies*, 387 F.3d 1146, 1162 (10th Cir.
27   2004) ("It is true that our opinion leaves open the uncomfortable possibility that [p]laintiffs may lack standing to sue
     under ERISA, but will then be preempted in state court under § 514 from asserting a state claim, leaving them with
28   no remedy.  Although this is a valid concern, we have not found it to be a concern of the federal judiciary.").

1    proceed would improperly permit the interpretation of the terms of ERISA plans under state law,

2    outside the exclusive federal framework created by Congress.

**B.    Dr. Windisch's Claims Are Preempted Because They Relate to ERISA Plans.**

5    Dr. Windisch argues that, even if his claims could be preempted under Section 514, they

6    are not because they "do not require any inquiry into [ERISA plans].  All that is relevant is the

7    [Provider] Agreement between [Dr. Windisch and Defendants]."  Opp'n at 7.  These assertions

8    are belied by Dr. Windisch's own allegations.

**1.    The Court Cannot Determine What Services Are Covered Under the Provider Agreement Without Interpreting an ERISA Plan.**

11    The crux of Dr. Windisch's state-law claims is that he has rendered "medically

12    necessary" services to Enrollees for which Defendants have unjustifiably denied or reduced

13    reimbursement.  *See, e.g.*, Compl. at ¶¶ 24, 25, 30.  In his Complaint, Dr. Windisch himself

14    states that it cannot be determined from his Provider Agreement whether any particular denial or

15    reduction of reimbursement was justified: Dr. Windisch alleges that Defendants employ

16    "utilization review" systems "to determine…whether healthcare services are 'medically

17    necessary,' and, therefore, compensable," but concedes that "[n]either the [Provider]

18    Agreement[] nor any other documents provided to participating physicians contain an adequate

19    description of any guidelines, polices, or procedures for determining whether a healthcare service

20    is medically necessary."  Compl. at ¶ 24.  Indeed, the only way to determine whether a particular

21    health care service rendered to a particular Enrollee is covered is by referencing the applicable

22    ERISA plan.  *See* Mot. to Dismiss at 7-9.

23    Dr. Windisch's allegations confirm that the Court will not be able to discern from the

24    Provider Agreement alone whether a particular service provided to a given Enrollee was covered

25    under the applicable ERISA plan.  Indeed, to determine whether Defendants' denial or reduction

26    in payment was justified, the Court must look to the ERISA plan itself to determine whether the

27    service was covered, and if so, the level of reimbursement afforded under the plan.  *See* PPO

28    Evidence of Coverage at 16-28; HMO Evidence of Coverage at 16-29 (schedule of benefits

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    stating that the plans will pay only for covered services and "after the applicable copayment(s) or

2    coinsurance are satisfied…specific copayment and coinsurance amounts are shown in [the

3    Enrollees] Summary of Benefits").

4        Despite his allegations to the contrary, Dr. Windisch maintains that his claims are not

5    preempted because they do not require interpretation of any ERISA plan. For support, he relies

6    on *Blue Cross of Cal. v. Anesthesia Care Assocs. Med Group*, 187 F.3d 1045 (9th Cir. 1999).

7    But *Anesthesia Care* is inapposite. In that case, providers entered into agreements with the

8    insurer. Of particular importance was the fact that the agreements stated that the providers

9    would be paid by the insurer based on fee schedules, which were attached to their agreements, or

10    based on the provider's "covered billed charges," whichever was less. The agreements stated

11    that any changes to the fee schedules were subject to review by the insurer's physician advisory

12    committee prior to adoption.

13        When the insurer amended the fee schedules, the providers sued on grounds that the

14    amendment was improper under the terms of their provider agreements. The insurer argued that

15    the providers' state-law claims were preempted by ERISA. According to the insurer,

16    adjudication of the providers' claims depended on the interpretation of the terms of an ERISA

17    plan because the providers' agreements referenced "covered charges." *Id.* at 1051. The court

18    rejected that argument because the question of what charges were covered was not relevant to the

19    dispute. *Id.* Rather, the dispute pertained to the manner in which the insurer had amended the

20    provider agreements' fee schedules. *Id.* In *Anesthesia Care*, the question of whether the fee

21    schedule was properly amended could be determined without interpreting the scope of coverage

22    under any ERISA plan, and thus without implicating the benefits available to beneficiaries.

23    Unlike *Anesthesia Care*, this case is not based on allegedly improper amendments to fee

24    schedules or to Dr. Windisch's Provider Agreement; rather Dr. Windisch's claims directly

25    implicate the scope of "covered services" under ERISA plans, so the *Anesthesia Care* decision

26    provides no guidance on the ERISA issue raised here.

27        Nevertheless, Dr. Windisch seizes on the court's statement in that case that the dispute

28    was "not over the *right* to payment…but the *amount*, or level, of payment, which depends on the

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

terms of the provider agreements." *See* Opp'n at 10. According to Dr. Windisch, his dispute with Defendants also is over the amount of payment, rather than the right to payment, and thus does not require reference to any ERISA plan. *Id.* This argument ignores the facts of this case and Dr. Windisch's allegations.

First, Dr. Windisch's claims involve more than the amount of payment to which Dr. Windisch believes he is entitled. Dr. Windisch repeatedly alleges that he was improperly *denied* payment for services. *E.g.*, Compl. at ¶¶ 25, 30, 36, 42. To the extent that Dr. Windisch alleges payment was improperly diminished, such claims also will require interpretation of one or more ERISA plans. As stated in the Provider Agreement, under the terms of an Enrollee's ERISA Plan, some services are covered in full, in part, or not at all. *See* Provider Agreement at Art. IV.L. And the appropriate level of coverage is set forth in the relevant ERISA Plan. *See* HMO Evidence of Coverage at 16 ("the Specific co-payment and co-insurance amounts are shown in your Summary of Benefits. [The ERISA Plan] will pay up to the maximum benefit specified for covered services."); PPO Evidence of Coverage at 16 (same). Thus, claims of improperly diminished payments cannot be adjudicated without interpreting the relevant ERISA plans.

Second, Dr. Windisch ignores the context of the court's statement about "right to payment" versus "amount of payment." When the court made the statement about "right to payment" versus "amount of payment," it was addressing the insurer's argument that the providers' claims were preempted by ERISA's complete preemption provision (Section 502). [3]/ The court rejected the insurer's complete preemption argument because the providers had not sued the insurer as assignees of their patients' benefits under an ERISA plan. Rather, they had sued on their provider agreements. When a provider sues based on an assignment of benefit, the

---

[3]/    "Complete preemption" under ERISA is a jurisdictional doctrine. A state cause of action that would fall within the scope of ERISA's scheme of remedies under Section 502 is completely preempted as conflicting with the intended exclusivity of that remedial scheme. Such claims must be brought in federal court under the ERISA statute (and a state-law claim that is completely preempted may be removed to federal court). Section 514, by contrast, expressly preempts all state laws (including state common law) insofar as they relate to an ERISA plan. Express preemption is a defense to a state-law claim, but does not confer federal jurisdiction over a state-law claim. In *Anesthesia Care*, the providers' state-law claim was not completely preempted because the providers were not suing on the basis of an assignment from an ERISA plan member, and thus the claim was not subject to ERISA's exclusive remedial scheme.

right to payment is derivative of the ERISA participants' right.  This type of claim *always* is preempted by ERISA's complete preemption provision (Section 502) because the provider stands in the shoes of the ERISA participant.  When a provider sues based on his provider agreement, the provider's right to payment is not derivative of his patient's, but rather based on the provider's own agreement with the insurer.  Because the provider does not stand in the ERISA participant's shoes, this type of claim is never preempted by ERISA's complete preemption provision.  But such a claim, as is the case here, *may* be preempted under the express preemption provision (Section 514) if its resolution requires interpretation of an ERISA plan.

Indeed, after rejecting the insurer's complete preemption argument, the court in *Anesthesia Care* went on to address separately the insurer's argument that the providers' claims were expressly preempted because they required interpretation of an ERISA plan.  187 F.3d at 1053.  The court rejected that argument because "the [p]roviders' claims [arose] from [the insurer's] breach of the provider agreements' provisions regarding fee schedules, and the procedure for setting them, not what charges are 'covered' under the [ERISA plan]."  *Id.* at 1051, 1053.  By contrast, Dr. Windisch's claims *do* arise from a disagreement over what charges are covered under the applicable ERISA plans and the extent they are covered under the plans.  *See,* *e.g.,* Compl. at ¶¶ 24-25 (alleging that Defendants have employed the "utilization review" process to deny reimbursement to Dr. Windisch on grounds that claims were not compensable).

Also misplaced is Dr. Windisch's reliance on *The Meadows*.  In that case, as discussed above in Section I.A., the court rejected the insurer's preemption argument on grounds that the provider's claims "arose because there was no plan coverage for the [individual], which was the very fact misrepresented by [the insurer], to the detriment of [the provider]."  *Id.*  Contrary to Dr. Windisch's suggestion, the court did not hold that adjudication of a provider's state-law claims against an insurer would never require interpretation of an ERISA plan.

Of the many cases Dr. Windisch cites in his opposition, only two involve issues similar to those raised here: *Fresno Community Hospital & Medical Center v. Souza*, No. CV F 07-0325 LJO SMS, 2007 WL 2120272 (E.D. Cal. 2007) and *In re Managed Care Litig.*, 135 F.Supp.2d

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1  1253 (S.D. Fla. 2001) ("*Managed Care I*"); 298 F. Supp. 2d 1259 (S.D. Fla. 2003) ("*Managed*

2  *Care II*").

3      *Managed Care* was an action by providers alleging that insurers had improperly denied

4  reduced, or delayed payment of claims.  In its cursory initial analysis, the court concluded that

5  the providers' claims were not preempted under ERISA because it believed that the providers'

6  allegations "might sustain a breach of contract claim without a need for reference to the

7  interpretation of ERISA plans." *Managed Care I*, 135 F. Supp.2d at 1268.  In a subsequent

8  opinion affirming its earlier holding, the court explained that interpretation of ERISA plans was

9  not required to adjudicate the providers' claims because the insurers had "already determined

10 that [the services rendered by the providers were] covered.  The dispute…centers on whether the

11 [insurers] have the right to deny full and complete payment to doctors based upon facts that do

12 not relate to coverage…." *Managed Care II*, 298 F. Supp. 2d at 1292-93.

13     This Court should not follow the *Managed Care* court's reasoning because, in reaching

14 its conclusion, the *Managed Care* court relied primarily on *Lordman* and *Anesthesia Care*.  As

15 discussed above, both *Lordman* and *Anesthesia Care* arose from very different factual

16 circumstances, and the reasoning in those decisions is not applicable to the issues raised in

17 *Managed Care* (or in this case).

18     Moreover, the *Managed Care* court's belief that it could adjudicate the providers' claims

19 without reference to the relevant ERISA plans is called into question by the Eleventh Circuit's

20 opinion in *Klay v. Humana*, 382 F.3d 1241 (11th Cir. 2004).  In holding that the providers'

21 contract claims could not be certified, the Eleventh Circuit noted that, in order for a provider to

22 succeed on a contract claim against an insurer, the provider "must prove the services he

23 provided, the request for reimbursement he submitted, the amount to which he was entitled, the

24 amount he actually received, *and the insufficiency of the [insurers'] reasons for denying full*

25 *payment*." *Id*. at 1264 (emphasis added).  If an insurer denies payment asserting that the service

26 rendered was not covered under the patient's plan, it is impossible for the provider to succeed on

27 his contract claim without proving that the service was, in fact, covered under the patient's

28 ERISA plan.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    For these reasons, the Court should decline to follow the conclusory ruling in *Managed*

2    *Care*, and instead be instructed by the court's thorough reasoning in *Souza*. As explained in

3    Defendant's opening memorandum, in *Souza*, Blue Cross and a hospital entered into a

4    "participating hospital agreement" (the "Hospital Agreement") under which the hospital would

5    render healthcare services at specified rates to Blue Cross's insureds and to "persons or entities

6    utilizing the Managed Care Network pursuant to a contract with Blue Cross." 2007 WL

7    2120272, at *2. An ERISA plan had entered into an agreement with Blue Cross and was one of

8    the entities utilizing the managed care network. As a result, enrollees in the ERISA plan were

9    entitled to receive services from the hospital and the ERISA plan reimbursed the hospital for

10   covered services provided to enrollees at the rates specified in the Hospital Agreement. The

11   Hospital Agreement made clear, however, that in the case of entities utilizing Blue Cross's

12   managed care network (i.e., ERISA plans), the only services covered under the Hospital

13   Agreement were those services covered under the relevant benefit agreement, *i.e.*, services

14   covered under the ERISA plan.[4]

15   After an enrollee in the ERISA plan received treatment at the hospital, the hospital sought

16   reimbursement from the ERISA plan pursuant to the Hospital Agreement. The ERISA plan

17   argued that the hospital's claims were preempted under Section 514. The court agreed, because

18   it could not adjudicate the dispute over the Hospital Agreement without interpreting the terms of

19   the ERISA plan:

20       [The hospital] is unable to avoid ERISA preemption and oversimplifies the
         dispute as merely between a health plan and a hospital. [The hospital] attempts to
21       ignore the import of the [ERISA plan], which [is] the bas[is] for [the hospital's]
         rights at issue. As a reminder, the [Hospital Agreement] provides that [the
22       hospital] is entitled to payment for services "rendered, covered under, and subject
         to the exclusions and limitations of the relevant [ERISA plan]." Such specific
23       reference to [an ERISA plan] requires application of the [ERISA plan] to
         distinguish this action from cases relied upon in *Community Hospital*.

24   *Souza*, 2007 WL 2120272, at *6. Because the hospital could not identify a separate agreement

25   between itself and the ERISA plan that did not require interpretation of the ERISA plan itself, its

26   claims were preempted. *See id.* (stating that the hospital could avoid preemption only if it

27   ─────────────────

28   [4] Contrary to Dr. Windisch's assertion, Blue Cross was not the insurer. Blue Cross merely negotiated in-network
     rates with the hospital and passed those rates on to the ERISA plan, which was the insurer.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

identified a separate contract between the parties that did not require interpretation of an ERISA plan). The same is true here. There is no separate contract under which Dr. Windisch's state-law claims can be adjudicated without reference to one or more ERISA plans, and thus his claims are preempted.

### 2. Adjudication of Dr. Windisch's Claims Will Encroach On ERISA-Regulated Relationships.

Dr. Windisch incorrectly suggests that adjudication of his claims will not "in any way affect[] the relationships of ERISA participants." *See* Opp'n at 8. To the contrary, adjudication of Dr. Windisch's claims will certainly affect the relationship between Enrollees and the relevant ERISA plans.

For example, as discussed above, Dr. Windisch alleges that Defendants improperly denied reimbursement for developmental testing he performed on a patient. *See* Section A, Compl. at ¶ 43. But the denial of reimbursement would be improper only if the service was covered under Dr. Windisch's Provider Agreement. In order for the Court to determine that the test was covered under Dr. Windisch's Provider Agreement, it would first have to determine that the test was covered under the applicable ERISA plan, as well. Such a decision unquestionably would affect the relationship between the patient and the ERISA plan by interpreting, and in this case expanding, the scope of the plan's coverage. Thus, adjudication of Dr. Windisch's claims will encroach on ERISA relationships, further demonstrating his claims are preempted.

### II. Dr. Windisch Has Failed To Allege A Claim For Consumer Fraud Under NRS 41.600.

Dr. Windisch seeks to maintain a claim for consumer fraud on the theory that Defendants have violated the Nevada Deceptive Trade Practices Act ("NDTPA"). *See* Compl. at ¶¶ 70-74; *see also* NRS 41.600(2)(e). Tellingly absent from Dr. Windisch's Complaint, however, are any facts that would, if proven true, establish a violation of the NDTPA. Apparently recognizing this fatal flaw in his Complaint, Dr. Windisch first claims that he does need to identify any particular section of the NDTPA to survive a motion to dismiss, but then concedes the "catch-all" provision in the NDTPA – NRS 598.0915(15) – is the specific statute that supports his consumer fraud

claim.[5]    Dr. Windisch further urges this Court to interpret the "catch-all" provision both

expansively and in a vacuum, without regard to the overall intent and purpose of the NDTPA, an

interpretation that would greatly expand the scope of the NDTPA to encompass any alleged

misrepresentation in any type of transaction.    Dr. Windisch's strained reading of the NDTPA

should be rejected, and his consumer fraud claim should be dismissed.

### A.    Dr. Windisch Has Failed to Allege An Act of Consumer Fraud.

Section 41.600 of the Nevada Revised Statutes states that "[a]n action may be brought by

any person who is a victim of consumer fraud" and defines consumer fraud as, among other

things, "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925." Accordingly, to

maintain a consumer fraud claim based on a violation of the NDTPA, a plaintiff must allege an

actual violation of the NDTPA. *See Picus v. Wal-Mart Stores, Inc.*, ___ F. Supp. 2d ___, 2009

WL 667419 at *6 (D. Nev. March 16, 2009). Conclusory allegations are, however, insufficient

to defeat a motion to dismiss, *see, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th

Cir. 1988), as are bare allegations of a statutory violation. *See, e.g., Lewis v. Bayer Corp.*, No. C

03-04402 JSW, 2004 WL 2196540 at * 2-3 (N.D. Cal. Sept. 27, 2004). Here, the Complaint fails

to allege any facts (apart from conclusory assertions of a statutory violation) that constitute a

specific violation of the NDTPA, and, therefore, the Complaint fails to allege a consumer fraud

claim. Indeed, the Complaint fails to allege how any of the facts therein constitute any one of

Nevada's deceptive trade practices, and Dr. Windisch can only point to the NDTPA's catch-all

provision, which does not apply in this case. *See* Compl. at ¶¶ 70 and 74 (generally referencing

NRS 598.0915 *et seq.* and "unfair and deceptive acts"). Thus, even if a plaintiff need not

identify any particular section of the NDTPA to survive a motion to dismiss, Dr. Windisch's

Complaint nonetheless fails because the facts alleged in the Complaint do not fall within any of

the specific statutory definitions of unfair trade practices.

Dr. Windisch seeks to overcome the foregoing conclusion by claiming that his Complaint

falls within the NTDPA's catch-all provision, which provides that "[a] person engages in a

---

[5] The mere fact that Dr. Windisch can only point to the catch-all provision and then try to force his allegations into that statute reveals that his consumer fraud claim fails.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1  'deceptive trade practice' if, in the course of his business or occupation, he: . . . [k]nowingly

2  makes any other false representation in a transaction." NRS 598.0915 (15). In particular, Dr.

3  Windisch alleges that Defendants violated NRS 598.0915(15) because they made

4  misrepresentations to his patients and to the Nevada Division of Insurance regarding medical

5  coverage. *See* Opp'n at p. 15 (*citing* Compl. at ¶¶ 46, 48, and 50). These purported

6  misrepresentations cannot, however, support Dr. Windisch's consumer fraud claim because they

7  were not made to him and, therefore, Dr. Windisch could not have relied on them in the

8  transactions at issue. *See Picus*, 2009 WL 667419 at *6 (plaintiff in consumer fraud case

9  alleging violation of catch-all provision in NRS 598.0915 must show reliance on the affirmative

10  misrepresentation). In fact, Dr. Windisch does not allege that he relied on Defendants' purported

11  misrepresentations, negating his consumer fraud claim. *See id.* Furthermore, there is absolutely

12  no causal connection between the misrepresentations Defendants allegedly made to third parties

13  and Dr. Windisch's purported damages because Dr. Windisch's damages relate solely to

14  reimbursement for medical services, which could not be affected by the statements that he

15  alleges were made to third parties. *See id.* (causation includes reliance in consumer fraud claim

16  based on alleged misrepresentations).

17      The crux of Dr. Windisch's Complaint is that he did not receive proper reimbursement

18  for medical services he provided to Defendants' Enrollees because Defendants (i) engaged in

19  bundling and downcoding, (ii) failed to recognize modifiers, (iii) denied payment based on

20  improper guidelines, (iv) reimbursed for vaccines at rates less than actual costs, (v) failed to

21  provide adequate staffing, (vi) failed to provide adequate explanations for their denials, (vi)

22  departed from CPT codes, and (vii) utilized their unequal bargaining power to force physicians

23  into one-sided agreements. Compl. at ¶ 3(a)-(h). Dr. Windisch expressly alleges that the

24  foregoing acts and omissions, not any purported misrepresentations to him or third parties, "have

25  deprived the Class of millions of dollars of lawful reimbursement for healthcare services

26  provided to Defendants' plan enrollees." Compl. at ¶ 4. Dr. Windisch further explains in his

27  consumer fraud allegations that "Defendants have willfully and knowingly engaged in unfair and

28  deceptive acts and practices that delay, impede, and/or deny lawful claims for reimbursement."

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    Compl. at ¶ 70. Dr. Windisch does not allege that any misrepresentations delayed, impeded, or

2    denied claims for reimbursement. Thus, Dr. Windisch's consumer fraud claim is not premised

3    on any false representations and, therefore, his after-the-fact references to alleged misstatements

4    to third parties and the NDTPA's catch-all provision do not and cannot support his claim for

5    consumer fraud.

6         The "transactions" at issue in Dr. Windisch's Complaint are his claims for reimbursement

7    and Defendants' handling of those claims. Dr. Windisch does not allege that Defendants

8    knowingly made any affirmative misrepresentations in these transactions to him or the purported

9    class. Nor does Dr. Windisch allege that he relied on any misrepresentations or that they caused

10   him injury. As a result, Dr. Windisch has failed to allege that Defendants knowingly made false

11   representations in a transaction in violation of NRS 598.0915(15) and, consequently, his

12   consumer fraud claim fails to state a claim upon which relief may be granted.

13        Apparently realizing that he has not and cannot allege a violation of NRS 598.0915(15)

14   based on the false representations alleged in his Complaint, Dr. Windisch claims that

15   Defendants' alleged non-disclosures constitute a violation of NRS 598.0915(15). *See* Opp'n, at

16   p. 14. The catch-all provision of the NDTPA, however, requires that a defendant knowingly

17   make a false representation, and nothing in the catch-all provision suggests that it applies to

18   cases involving non-disclosure. Thus, Dr. Windisch should not be permitted to proceed with a

19   consumer fraud claim based on alleged non-disclosures, when NRS 598.0915(15) expressly

20   requires the *making of a false representation*. Had the Nevada Legislature intended the catch-all

21   provision to cover cases involving non-disclosure, it could have said so. It did not, and NRS

22   598.0915(15) should not be interpreted as if the Nevada Legislature intended it to cover non-

23   disclosure cases.

24        Underscoring the foregoing conclusion are the fourteen deceptive trade practices

25   preceding the catch-all provision. Each of the fourteen deceptive trade practices defined in NRS

26   598.0915(1) – (14) require an affirmative misrepresentation regarding goods or services, and the

27   catch-all provision in subsection 15 should be read in the context of the statutory prohibitions

28   that precede it. *See Kokoszka v. Belford*, 417 U.S. 642, 650 (1974). On its face, and in the

15

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    context of the statute as whole, the catch-all provision requires an affirmative misrepresentation,

2    and Dr. Windisch's attempt to create a consumer fraud claim based on alleged non-disclosures in

3    a commercial setting should be rejected.

4         When a plaintiff seeks to pursue a consumer fraud claim under NRS 41.600 on the

5    premise that the defendant violated NRS 598.0915(15), the plaintiff must allege that the

6    defendant knowingly made a false statement in a transaction on which the plaintiff relied and

7    which caused damage to the plaintiff. *See Picus*, 2009 WL 667419 at *6. Here, Dr. Windisch

8    has failed to allege such a claim because he has failed to allege that Defendants knowingly made

9    any false statements in a transaction that caused him damage. Instead, Dr. Windisch has cobbled

10   together allegations regarding purported non-disclosures and statements to third parties that

11   could not have caused him any damages. Dr. Windisch has accordingly failed to allege a

12   deceptive trade practice under the NDTPA, and his consumer fraud claim should be dismissed.

13   **B.    NRS 598.0915(15) Should Be Interpreted Pursuant to the Whole Act Rule.**

14        As discussed above, Dr. Windisch has failed to allege a violation of the NDTPA because

15   the Defendants' alleged misrepresentations to third-parties and alleged non-disclosures do not

16   constitute false representations knowingly made by Defendants in a transaction. Dr. Windisch

17   has also failed to allege a violation of the NDTPA because he cannot turn his contract claims

18   under his Provider Agreement into deceptive trade practices through creative statutory

19   interpretation.

20        A recognized maxim of statutory interpretation is to give meaning to a particular

21   provision based upon the context in which it is found. Known as the "whole act rule," this rule

22   has been recognized as "the most realistic in view of the fact that a legislature passes judgment

23   upon the act as an entity, not giving one portion of the act any greater authority than another.

24   Thus any attempt to segregate any portion or exclude any other portion from consideration is

25   almost certain to distort the legislative intent." 2A Sutherland, § 47.02, at 139.

26        The United States Supreme Court has similarly endorsed the "whole act rule," stating:

27   "When 'interpreting a statute, the court will not look merely to a particular clause in which

28   general words may be used, but will take in connection with it the whole statute . . . and the

1  objects and policy of the law, as indicated by its various provisions, and give to it such a

2  construction as will carry into execution the will of the legislature." *Kokoszka*, 417 U.S. at 650.

3  In other words, all provisions and other features of a piece of legislation  must be given force,

4  and the provisions must be interpreted so as not to derogate from the force of other provisions

5  and features of the whole statute.  *See Dzyuba v. Mukasey*, 540 F.3d 955 (9th Cir. 2008);

6  *Lockerby v. Sierra*, 535 F.3d 1038 (9th Cir. 2008).

7  As noted, Dr. Windisch relies solely on the general, catch-all provision in NRS

8  598.0915(15) to support his consumer fraud claim.  In doing so, Dr. Windisch concedes that this

9  case does not involve consumer fraud or deceptive trade practices as defined elsewhere in the

10  NDTPA.  He claims, however, that the catch-all provision "is not limited to the sale of goods and

11  services to the general public, as the other enumerated provision are." *See* Opp'n at 16.  In other

12  words, Dr. Windisch asks this Court to read the catch-all provision out of context and thereby

13  eliminate all rational boundaries on the scope of the NDTPA.  This argument flies in the face of

14  the "whole act rule" by blatantly ignoring each and every other enumerated provision in NRS

15  598.0915; each of which are aimed at consumer transactions and prohibit deceptive marketing

16  with respect to "goods or services."  Dr. Windisch would have this Court believe that the Nevada

17  Legislature, by including a catch-all provision after defining the conduct it intended to prohibit

18  through fourteen narrowly drafted and specifically enumerated prohibitions, intended to expand

19  the protections of the NDTPA to any type of conceivable transaction between any two entities,

20  regardless of whether the transaction actually affected a consumer purchasing goods or services.

21  This Court should not adopt such an overly expansive interpretation on the NDTPA.

22  As additional support for his interpretation of the scope of the NDTPA, Dr. Windisch

23  cites *George v. Morton* and claims that *George* "did not involve the sale of goods or services to

24  the public." *See* Opp'n at 17.  Yet, Dr. Windisch's summary of the *George* case directs a

25  contrary conclusion.  According to Dr. Windisch, the plaintiff in *George* "alleged that the

26  defendants engaged in a number of deceptive trade practices in connection with the marketing

27  and sales of units in the project." *Id.* at p. 17.  Therefore, *George* involved the sale of

28  condominiums to the public at large.

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    Moreover, the plaintiff in *George* did not rely solely on the catch-all provision in NRS

2    598.0915(15), as does Dr. Windisch. 2007 WL 680789 at *11 (D. Nev. March 1, 2007). To the

3    contrary, the plaintiff alleged that the defendant failed to disclose a material fact in connection

4    with the sale or lease of goods or services (NRS 598.0923(2)), violated a state or federal statute

5    or regulation relating to the sale or lease of goods or services (NRS 598.0923(3)), and conducted

6    business without required licenses (NRS598.0923(1)). *Id.* The court even paraphrased the

7    foregoing claims by stating that the defendants "failed to disclose material facts *in connection*

8    *with the sale of Project units*" and that defendants "violated state or federal statutes or

9    regulations *regarding the sale of Project units.*" *Id.* at *11-12 (emphasis added). Thus, *George*

10   involved three specific violations of the NDTPA, in addition to the catch-all provision, and does

11   not stand for the broad proposition that every misrepresentation in any commercial transaction

12   gives rise to a claim for deceptive trade practices. The court in *George* did not even address the

13   issue presented here and, therefore, does not endorse the expansive application of the NDTPA to

14   contractual relationships like the one presented in this case.

15       The contractual relationship between the Dr. Windisch and the Defendants does not

16   involve the sale of goods or services. As a result, the alleged acts of the Defendants cannot be

17   pigeon-holed into the catch-all provision of the NDTPA, and this Court should reject Plaintiff's

18   interpretation of 598.0915(15) as "simply [prohibiting] false representations in a transaction –

19   any transaction – which is broader than the sale of goods and services" because such an

20   interpretation would turn any and every misrepresentation into a deceptive trade practice. *See*

21   Opp'n at 14. Rather, this Court should utilize a rational and holistic approach to interpret the

22   scope and coverage of the NDTPA, giving due weight to the other narrowly drawn and

23   specifically enumerated deceptive trade practices in the act. In the same vein, this Court should

24   also consider the act's legislative history to determine whether the NDTPA was intended to

25   apply to a professional relationship like the one between Dr. Windisch and Defendants.

26       The legislative history of the NDTPA confirms that the NDTPA was intended to have a

27   more limited scope than the one Dr. Windisch advocates. During the meetings of the Commerce

28   Committee on Assembly Bills 300 and 301, the bills creating the NDTPA and Consumer Affairs

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

18

Division, witnesses expressed their opinions regarding the types of protections needed <u>for</u> <u>consumers</u>. Dr. Charles Levinson of the Consumer's League noted that the proposed bills did not adequately cover food services. *See* Hearings on A.B. 301 Before the Committee on Commerce, 57th Session, 228 (1973). As an example, Dr. Levinson "presented two pieces of meat which were the same cut of meat, in his opinion, but indicated a price difference of 14%. This is the type of practice the consumer needs some protection from. The consumer has no recourse and there are presently no laws to cover this type of violation." *Id.* Mr. Tom Leen, also of the Consumer's League, testified that

> there is a great need for consumer laws to cover deceptive practices and he gave historical reasons for this; that ***consumers today are forced to buy products*** that they really don't understand; that there is ***no equality in bargaining between consumers and retailers***; that there are many occasions when consumers are defrauded in ways that are not illegal and are very difficult to prove; that Nevada is one of the very few states that have no consumer protection laws.

*Id.* An investigator for the Washoe County District Attorney's Office testified that "because most of the states surrounding Nevada have strong consumer laws, crooks are driven to Nevada where there aren't any." *Id.* at 230. An example given was "used cars being sold for new." *Id.*

The foregoing testimony demonstrates the types of business practices the Nevada Legislature sought to prohibit by its passage of the NDTPA. In particular, the legislative history shows that the NDTPA is aimed at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate. Plaintiff's attempt to expand the scope of the act to "any transaction," without appropriate limitation, ignores this intent underlying the NDTPA. Furthermore, there is no evidence that the Nevada Legislature intended to govern commercial relationships like the one between Dr. Windisch and Defendants when it enacted the NDTPA, further demonstrating that NRS 598.0915(15) does not apply in this case.

**C. Dr. Windisch Was Not Damaged As a Result of His Reliance on the Defendants' Purported Act of Consumer Fraud.**

Assuming, *arguendo*, that Dr. Windisch has adequately alleged that Defendants engaged in an act of consumer fraud, Dr. Windisch nevertheless fails to state a claim for relief because he has not and cannot plead damages resulting directly to him as a result of the Defendants'

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    purported deceptive trade practices, as opposed to Defendants' supposed breach of the Provider

2    Agreement.

3         In a decision from the District of Nevada issued only days before the Defendants filed

4    their Motion to Dismiss, the court provided a detailed analysis of the required elements for a

5    consumer fraud claim. In *Picus v. Wal-Mart Stores, Inc.*, the plaintiff filed a class action lawsuit,

6    alleging a scheme by the defendants to sell pet food to consumers as "Made in the USA," when

7    in fact components were manufactured outside the United States. 2009 WL 667419 *1 (D. Nev.

8    2009). Plaintiff asserted three claims against the defendants: violation of the NDTPA, fraud, and

9    unjust enrichment. *Id*. In granting the defendants' motion to deny class certification, the court

10   delved into the question of whether common issues predominate. *Id*. at *4.

11        The court noted that the "Nevada Supreme Court has not specified the elements of an

12   NDTPA private cause of action, including whether causation and reliance are required." *Id*. at

13   *5. After setting forth the applicable rules of statutory interpretation, the court noted that

14   pursuant to NDTPA's plain language, "to establish a private cause of action, a plaintiff must

15   show a defendant engaged in a consumer fraud of which the plaintiff was a victim." *Id*. Further,

16   the plaintiff must demonstrate damages, an element that implicitly contains a causation

17   requirement. *Id*.

18        Importantly, the court looked to several other jurisdictions to determine that reliance is

19   part of the causation element. *Id*. at *6. For example, Oregon requires proof of the consumer's

20   reliance-in-fact when an alleged violation is an affirmative misrepresentation, as opposed to a

21   failure to disclose. In California, a plaintiff suing for misrepresentations in connection with a

22   sale, must prove she relied on a material misrepresentation. In Illinois, although not requiring

23   actual reliance, a plaintiff must nevertheless show proximate causation. *Id*. In light of the

24   foregoing authority, the district court concluded that "for a private NDTPA claim for damages,

25   the Nevada Supreme Court would require, at a minimum, a victim of consumer fraud to prove

26   that (1) an act of consumer fraud by the defendant (2) caused (3) damages to the plaintiff." *Id*.

27   Moreover, the Court reasoned the causation prong includes reliance because the defendants

28   "allegedly made an affirmative misrepresentation and Plaintiff could prove she sustained

1  damages as a result of Defendants' alleged misrepresentation only by demonstrating she relied

2  upon a 'Made in the USA' label." *Id.*

3        As already set forth above, Dr. Windisch has failed to plead the first required element of

4  a consumer fraud claim because he fails to allege an act of consumer fraud by the Defendants. In

5  addition, Dr. Windisch's consumer fraud claim also fails as a matter of law under *Picus* because

6  it does not set forth any causal link between the purported act of consumer fraud and the alleged

7  damages he suffered.

8        In particular, the Complaint alleges that "Defendants were aware that their

9  representations to their enrollee that vaccines were 'covered 100%' was deceptive and

10  misleading, as Defendants did not cover the actual costs of the vaccine to the Plaintiff." *See*

11  Compl., at ¶48. Because Dr. Windisch alleges that Defendants made such affirmative

12  misrepresentations, he must also plead reliance as part of the causation requirement of the

13  consumer fraud claim. However, the Complaint is devoid of any such allegations regarding

14  either Dr. Windisch's or the public's reliance on the Defendants' purported misrepresentations.

15        Instead, the Complaint sets forth a tortured association between the Defendants' actions

16  and the resulting "adverse impact" on the general public such as "threatening the financial

17  stability and viability of the medical practices of the physicians" and "increasing costs of

18  physician services within the State of Nevada." *See* Compl., at ¶72. Aside from these tenuous

19  claims regarding damages to the public, the Complaint only summarily alleges that "Plaintiff and

20  other members of the Class have been injured," which injuries are necessarily based on the

21  adjudication of the claims, not any misrepresentation. *Id.* at ¶73.

22        It is evident that Dr. Windisch cannot articulate the damages he purportedly suffered as a

23  result of an act of consumer fraud by the Defendants. Instead, the monies purportedly due to the

24  Plaintiff are causally linked only to the contractual breaches alleged in the Complaint.

25  Accordingly, Plaintiff's consumer fraud claim fails as a matter of law and should be dismissed.

26  ///

27  ///

28

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

### III. Because Dr. Windisch's Consumer Fraud Claim Sounds in Fraud, It Must Be Plead With Particularity.

Dr. Windisch further attempts to avoid the heightened pleading requirements of Rule 9(b) by alleging that "there is no fraud claim asserted, and there are no allegations of fraud or of the elements of fraud – e.g., intent to deceive and reliance." *See* Opp'n at p. 19. While the Plaintiff has not alleged a claim for common-law fraud, Dr. Windisch cannot avoid the reality that his allegations are indeed, "grounded in fraud."

Dr. Windisch asserts that "there is no allegation anywhere in the Complaint that there was an intent to deceive or *any overarching fraudulent scheme* to defraud Plaintiff or the public." *See* Opp'n at 20. (emphasis added). But paragraph 2 of the Complaint states that "Defendants engaged in *a pattern of improper and deceptive conduct* and business practices by *carrying out a scheme* to deny, impede, delay, and reduce lawful reimbursement" to Dr. Windisch. *See* Compl. at ¶2 (emphasis added). Throughout the Complaint, Dr. Windisch alleges that Defendants "routinely and unjustifiably" engaged in various actions constituting deceptive trade practices and/or violations of the parties' contractual relationship. In addition, paragraph 3(b) of the Complaint states that the Defendants improperly apply guidelines "that *Defendants know is unreasonable* for the purpose of denying payment for medically necessary treatments." *Id.* Similarly, paragraph 48 alleges that "*Defendants were aware* that their representations to their enrollee that vaccines were 'covered 100%' was deceptive and misleading, as Defendants did not cover the actual costs of the vaccine to the Plaintiff." (emphasis added).

Dr. Windisch's attempt to argue that his allegations do not "sound in fraud" elevates form over substance. The consumer fraud claim is plainly "grounded in fraud" because Dr. Windisch alleges a pattern and practice of conduct by the Defendants, and further alleges that Defendants knowingly undertook such a course of action. Accordingly, because Dr. Windisch asserts a unified course of fraudulent conduct and relies on that conduct as the basis for his claims, the complaint is grounded in fraud and must be plead with particularity. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

1    Moreover, Dr. Windisch must plead his claims with particularity because he has based

2    his deceptive trade practices claim on the catch-all provision of NRS 598.0915(15).    The

3    language of NRS 598.0915(15) requires affirmative misrepresentations of fact, which necessarily

4    sound in fraud.  *See George v. Morton*, 2007 WL 680789 at *11 (D. Nev. March 1, 2007)

5    (reasoning that deceptive trade practice claim brought pursuant to the catchall provision of the

6    NDTPA sounded in fraud and had to be plead with particularity).

7    If this Court were to permit Dr. Windisch to proceed with his consumer fraud claim, Dr.

8    Windisch must plead such a claim with particularity, so that the Defendants are provided proper

9    notice of the nature of the allegations against them.

10    **IV.    Dr. Windisch Fails to State Any Distinct Allegations Against Renown.**

11    In Nevada, "[t]he corporate cloak is not lightly thrown aside."  *Baer v. Amos J. Walker*,

12    452 P.2d 916, 916 (Nev. 1969).  The basic requisites for the application of the doctrine of alter

13    ego are well established: (1) the corporation must be influenced and governed by the person

14    asserted to be its alter ego, (2) there must be such unity of interest and ownership that one is

15    inseparable from the other; and (3) the facts must be such that adherence to the fiction of a

16    separate entity would, under the circumstances, sanction a fraud or promote injustice.  *Bonanza*

17    *Hotel Gift Shop v. Bonanza No. 2*, 596 P. 2d 227, 229 (Nev. 1979).  A mere showing that one

18    corporation is owned by another, or that the two share interlocking officers or directors is

19    insufficient to support a finding of alter ego.  *Id*.  It must further be shown that the subsidiary

20    corporation "is so organized and controlled, and its affairs are so conducted that it is, in fact, a

21    mere instrumentality or adjunct of another corporation."  *Id*. (citations and quotations omitted).

22    "Nor is mere mutuality of interest sufficient to make such a showing, without evidence of a

23    commingling of funds or property interests, or of prejudice to creditors."  *Id*.

24    Here, Dr. Windisch names Renown as a defendant alleging solely that "Renown Health is

25    the parent of defendant Hometown Health Plan, Inc., and is headquartered in Reno, Nevada."

26    *See* Compl., at ¶10.  This is precisely the type of allegation that the Nevada Supreme Court has

27    deemed insufficient.  *See id*.

28

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

23

1    Dr. Windisch has not alleged (and cannot allege) that any of the defendants are "mere

2  instrumentalit[ies]" of Renown, that corporate formalities have been disregarded, or that

3  adherence to the corporate form would "sanction a fraud or promote injustice." Dr. Windisch's

4  claims against Renown are not plausible on their face and should be dismissed. *See Bell Atl.*

5  *Corp. v. Twombly*, 550 U.S. 544, __, 127 S.Ct. 1955, 1960 (2007) (to survive a motion to

6  dismiss, a plaintiff's complaint must allege "enough facts to state a claim to relief that is

7  plausible on its face").

8    **V.    Conclusion.**

9    For all the foregoing reasons, this Court should dismiss Dr. Windisch's complaint for

10  failure to state a claim upon which relief may be granted.

11  DATED this 21st day of May 2009

12                  HOLLAND & HART LLP

14                  By /s/    Brad M. Johnston
                       Brad M. Johnston, Esq.

15                       Nevada Bar No. 8515
                       Tamara Jankovic, Esq.

16                       Nevada Bar No. 9840
                       Holland & Hart LLP.

17                       5441 Kietzke Lane, Second Floor
                       Reno, Nevada  89511

19                       Emily M. Yinger, Esq. *(Admitted Pro Hac Vice)*
                       N. Thomas Connally, Esq. *(Admitted Pro Hac Vice)*

20                       Michael M. Smith, Esq. *(Admitted Pro Hac Vice)*
                       HOGAN & HARTSON LLP

21                       Park Place II
                       7930 Jones Branch Drive

22                       McLean, Virginia 22102-3302

23                       *Attorneys for Defendant*

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that on the 21 st day of May 2009, I served a true and correct copy of the foregoing **DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6)** by electronic transmission listed below :

    X____        filed electronically with the U.S. District Court and therefore the court's computer system has electronically delivered a copy of the foregoing document to the following person(s) at the following e-mail addresses:

G. Mark Albright, Esq.
Albright Stoddard Warnick & Albright
Quail Park I, Building D-4, 801 South Rancho Dr.
Las Vegas, Nevada 89106
Email: gma@albrightstoddard.com

Edith M. Kallas, Esq.
Ilze C. Thielmann, Esq.
Laurence J. Hasson, Esq.
Whatley Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036
Email: ekallas@wdklaw.com
Email: ithielmann@wdklaw.com
Email: lhasson@wdklaw.com

*Attorneys for Plaintiff*

/s/_____
Liz Ford,
An Employee of Holland & Hart LLP

4522857_1.DOC

HOLLAND & HART LLP
5441 KIETZKE LANE
SECOND FLOOR
RENO, NV 89511

25