**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KEVIN WINDISCH, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> HOMETOWN HEALTH PLAN, INC. et al., ) <br> ) <br> Defendants. ) <br> ) | 3:08-cv-00664-RCJ-WGC <br><br> **ORDER** |

This is a class action brought by a doctor against four healthcare organizations for breach of contract, bad faith, and consumer fraud in connection with alleged systematic and improper "downcoding" and "bundling" of healthcare reimbursement claims. Before the Court is a motion to certify the class and two motions to exclude certain expert opinions for the purpose of class certification. For the reasons given herein, the Court denies the motions.

**I.     FACTS AND PROCEDURAL HISTORY**

    **A.     The Defendant Entities**

Defendant Hometown Health Plan, Inc. ("Hometown HMO") is a health maintenance organization ("HMO"). (Compl. ¶ 7, Dec. 19, 2008, ECF No. 1). Defendant Hometown Health Providers Insurance Co., Inc. ("Hometown PPO") is a preferred provider organization ("PPO"). (*Id.* ¶ 9). HMOs and PPOs enter into agreements with enrollees (patients) to provide health insurance in exchange for premium payments. HMOs and PPOs enter into agreements with health care providers (doctors, chiropractors, etc.) for the providers to provide care to enrollees at specified prices. Defendant Hometown Health Partners, Benefits Administrators, Inc.

("HHP") was a third-party administrative and management service organization. (*Id.* ¶ 8). In 2004, HHP merged into Hometown PPO and ceased to exist as a separate entity. (Mot. Dismiss, Mar. 19, 2009, ECF No. 18). Before the merger, HHP provided a provider network and services such as claims adjudication, re-pricing, eligibility verification, utilization review, and case management. (Compl. ¶ 21). Hometown PPO now provides these services. (Mot. Dismiss). Defendant Renown Health ("Renown") was HHP's parent company. (Compl. ¶ 10).

### B. The Primary Care Physician Agreement

Plaintiff Kevin Windisch, M.D. agreed to provide enrollees with applicable primary care services consistent with Hometown HMO's and HHP's utilization management and quality assurance procedures. Hometown HMO and HHP agreed to compensate Plaintiff for applicable primary care services according to their standard payment policies. Hometown HMO agreed to compensate Plaintiff for 85% of the charges Plaintiff billed Hometown HMO's enrollees. For Medicare patients, HHP agreed that third-party insurers would compensate Plaintiff at 115% of Medicare fees, or via alternative methods if there were no ascertainable Medicare fees. Hometown HMO and HHP also agreed to pay certain amounts for various drugs and immunizations.

The Primary Care Physician Agreement (the "Agreement") defines "Covered Services" as "health care services covered under a group or individual coverage agreement issued and/or administered by [Hometown HMO and HHP], the relevant portions of which shall be made available to [Plaintiff] by [Hometown HMO and HHP]." However, the Agreement does not limit Hometown HMO's and HHP's obligation to compensate Plaintiff for "Covered Services" or Plaintiff's obligation to perform services for "Covered Services." In light of other provisions regarding non-"Covered Services," the parties intended to obligate Plaintiff to perform "Covered Services" for enrollees and intended for Hometown HMO and HHP to compensate Plaintiff for "Covered Services."

**C.     Complaint**

Plaintiff sued Hometown HMO, Hometown PPO, HHP, and Renown in this Court for breach of contract, breach of the implied covenant of good faith and fair dealing, and consumer fraud under Nevada Revised Statutes ("NRS") section 41.600 and NRS chapter 598.[1] Plaintiff alleges that Defendants carried out "a scheme to deny, impede, delay, and reduce lawful reimbursement to Plaintiff" and a putative class of healthcare providers who rendered services to Defendants' enrollees. (*See id.* ¶ 2).  Plaintiff alleges that Defendants refuse to pay for more than one service per visit or incident ("bundling"), change submitted claims to billing codes with lower reimbursement rates ("downcoding"), and refuse to reimburse at the proper rate in complex cases ("modifiers"). (*See id.* ¶ 3.a).  Defendants also allegedly improperly apply guidelines to deny payments for services, (*see id.* ¶ 3.b), reimburse physicians for vaccines at a rate lower than the actual cost physicians must pay, but represent that they fully cover the vaccines to enrollees, (*see id.* ¶ 3.c), fail to provide adequate staffing to deal with physicians' inquiries, (*see id.* ¶ 3.d), fail to make timely payments to physicians, (*see id.* ¶ 3.e), fail sufficiently to explain why they deny or reduce payments to physicians and fail to provide physicians with fee schedules or coding procedures, (*see id.* ¶¶ 3.f, 3.g), use their unequal bargaining positions to force physicians into one-sided agreements, (*see id.* ¶ 3.h), and misrepresented to the Nevada Division of Insurance that the Agreement stated that certain services were not reimbursable when performed in a physician's office, (*see id.* ¶ 50).

The Court denied Defendants' motion to dismiss based on ERISA preemption because coverage under non-party enrollees' ERISA plans was not in dispute, but only reimbursements under the non-ERISA-dependent Agreement, (*see* Order 7:15–8:14, Mar. 5, 2010, ECF No. 53), Plaintiff had sufficiently pled consumer fraud, (*see id.* 8:16–12:6), and Plaintiff had sufficiently

---

[1] Section 41.600 provides for a private right of action for violations of, *inter alia*, certain provisions of chapter 598. *See* Nev. Rev. Stat. § 41.600(1), (2)(e).

alleged alter ego liability against Renown, (*see id.* 12:8–24). Plaintiff has now moved for class certification.

## II.   LEGAL STANDARDS

In order to obtain class certification under Rule 23, plaintiffs must satisfy two sets of criteria. First, plaintiffs must show each of the following:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Rodriguez v. Hayes*, 591 F.3d 1105, 1121–22 (9th Cir. 2010) (citing Fed. R. Civ. P. 23(a)).

Second, plaintiffs must show at least one of the following:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already

        begun by or against class members;

        (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)–(3); *see Hayes*, 591 U.S. at 1122. A district court should not address the merits of a case directly when determining certification under Rule 23, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974) (holding that a class action plaintiff cannot argue the merits of his case to circumvent the Rule 23 certification requirements), except to the extent that determining the certification motion requires probing the merits, in which case the court must address any relevant merits issues, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011). A court considering a motion to certify must consider the merits so far as is necessary to determine whether the plaintiff has shown the certification requirements are satisfied, but if this showing is made a court should not then refuse to certify simply because it believes the case should be dismissed or summarily adjudicated in favor of the defendant. In such a case, the proper procedure is to certify and wait for any dispositive motions, which if granted will adjudicate the claims of all members of the class. *See* Fed. R. Civ. P. 23(c)(3).[2]

## III. ANALYSIS

Plaintiff has asked the Court to certify the following class: "All providers who are, or were, participating providers in the provider networks of [Defendants] in the state of Nevada at

---

[2] In other words, it is entirely possible for a large group of persons with legally and factually similar claims, and who are adequately represented by a proposed class representative having his own similar claim, to have ultimately unmeritorious claims. For example, imagine that a defendant screamed at a crowd of 1000 persons, "You're all a bunch of jerks!" One of the "jerks" might file a class action with claims for assault, battery, and defamation. Even though the claims would be unmeritorious, the requirements of Rule 23 might very well be satisfied. The certification of unmeritorious claims serves the same goal of efficiency as does the certification of meritorious claims; it allows a court to adjudicate a mass of sufficiently similar claims at once, whether in favor of the plaintiffs or the defendant.

any time during the period from December 19, 2002 to present." (Mot. Class Certif. 1, Mar. 18, 2011, ECF No. 87). The Court will not certify such a class. Plaintiff's claims turn on the contention that Defendants' practice of bundling together certain claims and downcoding others, resulting in improperly low reimbursements under the Agreement, constitutes a breach of contract, a breach of the duty of good faith and fair dealing, and deceptive trade practices. Defendants respond that providers often improperly "unbundle" and "upcode" services, and that Defendants' corrections are proper. The merits of the case are not directly at issue, however. *See Eisen*, 417 U.S. at 177–78. Whether any particular adjustments to reimbursement claims are ultimately found to have been proper or improper, or to have constituted deceptive trade practices, all parties appear to agree that the gravamen of Plaintiff's claims are that Defendants reimbursed Plaintiff and putative class members at an improperly low rate under the Agreement due to downcoding and bunding.

### A.     Rule 23(a)

### 1.     Numerosity

Ms. Tracy Walker, Defendants' contracting officer, testified that there are approximately 900 physicians who have Agreements with Defendants. (*See* Walker Dep. 11:19–21, Feb. 9, 2011, ECF No. 87-6). This would be sufficient to satisfy the numerosity requirement if Plaintiff could also show that this number of doctors have suffered the same downcoding or bundling determinations by Defendants. But he has not shown this. It is not clear at all how many putative class members have suffered the same downcoding or bundling determinations as Plaintiff.

The defects in commonality will be further discussed, *infra*, but the Court notes that the numerosity and commonality analyses are intrinsically linked. It is not enough for a class plaintiff: (1) to show that a great number of putative class members have a contract with the defendant; and (2) to allege that the defendant has violated that same contract with respect to the

proposed class representative. Rather, a proposed class representative must show that the defendant has treated a sufficient number of putative class members in the same way, in alleged violation of the contract, which is different. In the former case, as here, the class plaintiff is speculating as to the harm to other persons. He only alleges certain harm to himself and that there are other persons with a similar contract who may have suffered the same harm from the same act of the defendant. In other words, he has alleged the numerosity of persons who *may have been* harmed, but not the numerosity of persons who *have been* harmed. This does not mean the plaintiff must prove his case and others' at the class certification stage. But he must at least *allege* that the same act or acts by the defendant has caused the same harm to a sufficiently numerous class of persons. In the present case, this would require allegations that such-and-such number of doctors with substantially similar agreements were subjected to such-and-such particular improper downcodings and/or bundlings. Plaintiff has not alleged such facts, much less provided evidence of them. Perhaps he can after some tedium, but he cannot obtain class certification unless and until he does.

### 2. Commonality

The Supreme Court recently clarified that:

> [c]ommonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Dukes*, 131 S. Ct. at 2551 (2011) (citation omitted). The Rule 23(a) requirements are not simply pleading standards that can be satisfied with bare allegations but standards that "[a] party seeking class certification must affirmatively demonstrate [and] be prepared to prove . . . ." *Id.*

Plaintiff argues that "[Defendants use a] centralized, unified system of automated claims

1   processing, which automatically reduces payments to providers . . . . [through] use of software
2   that is intentionally programmed to cheat providers . . . ." They also allege that the form of the
3   Agreement entered into between Defendants and each provider contains only minor variations
4   that do not differ from provide-to-provider in any material respect. In other words, Plaintiff
5   claims that Defendants use a standardized software program to bundle and downcode
6   reimbursement claims in a way that is contrary to the materially standardized Agreement and the
7   statute. If this is true, the commonality requirement could be satisfied under *Dukes* if Plaintiff
8   also provided evidence that other doctors suffered the same precise downcodings or bundlings,
9   because the Court would be able to compare the standard logic used to process reimbursement
10  claims against the Agreement and statute, respectively, and determine whether the use of the
11  logic violated either, thereby determining the claims of many doctors "in one stroke." *See id.*
12  Unlike in *Dukes*, Plaintiff here does not allege many separate bad acts by multiple actors
13  connected only by the legal theory of relief, but rather a unified bad act—the decision to use the
14  allegedly improper claims processing logic—by the same actor resulting in similar harm to many
15  persons. *See id.* at 2552 ("Here respondents wish to sue about literally millions of employment
16  decisions at once. Without some glue holding the alleged reasons for all those decisions
17  together, it will be impossible to say that examination of all the class members' claims for relief
18  will produce a common answer to the crucial question why was I disfavored."). The "glue" here
19  is Plaintiff's allegation that a single decision was made to use an (improperly) standardized
20  reimbursement logic. Dukes made no such claim. Her proposed "glue" that a "corporate
21  culture" tied together the millions of separate decisions was too thin to show common issues of
22  fact. *See id.* at 2552–53. A sufficient fact pattern would have existed in *Dukes* to show
23  commonality if a single corporate actor had instituted a policy resulting in the alleged
24  discrimination suffered by all putative class members in that case. *See id.* at 2551 ("Their claims
25  must depend upon a common contention—for example, the assertion of discriminatory bias on

the part of the same supervisor."). Still, Plaintiff's "glue" is not thick enough unless he can allege how many doctors were subjected to which particular improper downcodings and bundlings.

Plaintiff also argues that Defendants "routinely and unjustifiably fail[] to make payments to Plaintiff and Class members within the time periods prescribed by the applicable provisions of [the Agreement and NRS]" and that Defendants routinely fail to pay interest on past-due reimbursements or to provide sufficient explanations for denials and reductions. These aspects of the claims do not sufficiently allege a common bad act, but, as in *Dukes*, allege a pattern of similar bad acts with no common decision or decision-maker. It is possible that some of these allegations were motivated by a standard policy, but Plaintiff has not alleged it. As it stands, the only "glue" Plaintiff has provided is his allegation that such practices are routine. He has alleged similar grievances, not a common bad act.

Plaintiff must provide evidence of his class allegations supporting commonality as to the improper-reimbursement-logic claims. *See id.* First, Defendants' "person most knowledgeable" deponent for contracting, Ms. Walker, testified that the Agreements are based on standard templates and that the 15–20% of Agreements having any variation at all do not differ in any way relevant to claim processing. (*See* Walker Dep. 9:7–10, 11:22–13:9). Second, Plaintiff provides evidence showing that Defendants require providers to submit ICD-9 (Internal Classification of Diseases), CPT-4 (Current Procedural Terminology), and HCPCS (Healthcare Common Procedure Coding System) codes, and that since 1998, Defendants' automated system reviews and edits submitted codes to ensure they are "accurate and appropriate" using "computer programming logic." (*See* Hometown Healthcare Provider Manual § 5.30, July 2001, ECF No. 87-11). That Defendants provided this manual in discovery is supported by a declaration. (*See* Thielman Decl. ¶ 6, Mar. 18, 2011, ECF No. 87-3). But, again, Plaintiff does not indicate how many doctors were subjected to which downcodings and bundlings.

1    Defendants argue that Plaintiff's real complaint is that Defendants use their own
2 "standard payment policies," as noted in the Agreement, as opposed to what Plaintiff calls
3 "standard CPT practices." But this is an argument directed to the merits. If it is true that the
4 Agreement indicates that Defendants process claims in accordance with "standard payment
5 policies," and if it is also true that the automated logic used to process claims followed those
6 policies (or defined them) and that the logic is available on Defendants' website for providers to
7 examine, then Defendants have nothing to fear from class certification, because the certification
8 of a class with unmeritorious claims will simply facilitate the disposition of many potential
9 claims against Defendants on summary judgment. But the fact that the claims may be ultimately
10 unmeritorious does not affect the Court's certification determination. Defendants also argue that
11 each claim is unique and must be separately examined, because each coding or bundling decision
12 is separate. However, they admit that they use an automated computer system ("ClaimCheck")
13 to rebundle and recode claims, and they in fact provide examples. Defendants admit that claims
14 processing does not involve a human being looking at claims, examining the patient's file, and
15 deciding whether to recode or rebundle claims. If this were so, this would be a *Dukes*-like case,
16 where thousands or millions of separately motivated decisions were at issue. But here,
17 Defendants admit that processing of claims by ClaimCheck involves ClaimCheck examining
18 each individual claim against a standardized logic for rejecting or bundling claims. For example,
19 if a provider submits CPT codes for a cornea transplant and a determination of venous pressure
20 for the same visit, ClaimCheck will automatically reject the CPT code for the latter procedure,
21 because it is an inherent part of the former procedure. This is an example of "bundling." Also,
22 ClaimCheck will reject the CPT code for a new patient if the system indicates the patient has
23 already visited that provider. Finally, ClaimCheck includes "downcoding" edits that compare
24 the diagnosis code to the procedure code. If the procedure is too extensive given the diagnosis,
25 ClaimCheck will recode and reimburse only for the appropriate procedure. There are

approximately four million such checks. Whenever ClaimCheck rejects or changes a CPT code, Defendants notify providers and give them an opportunity to resubmit the claim at the appropriate code, as determined by ClaimCheck, or argue why the first code submitted was appropriate.

Although the examination of individual denials of appeals is not suitable for class-wide resolution, the examination of the propriety of the ClaimCheck logic itself is. It may be tedious for the Court or a jury to look at thousands of disputed coding procedures to see if they are proper or improper, but it will not be any less tedious for hundreds of courts or juries to do so. So long as each determination will determine many individual claims, there is commonality, at least as to many putative subclasses. A defendant cannot avoid a finding of commonality simply by pointing out that it made thousands of separate decisions, when each decision was made according to a uniform logic and applied to hundreds of plaintiffs. If a single authority at Wal-Mart had instituted thousands of standardized rules governing promotions, with each rule applied over the years to thousands of putative class members, the Court may have found commonality in that case. Assuming Plaintiff were to obtain a class verdict finding certain reimbursement procedures to have been improper, the remaining difficulty will be determining the value of each class member's individual claims. However, like the task of determining the propriety of coding procedures, this post-trial task is better characterized as a tedium than a difficulty, and it could be left to Plaintiff's counsel in preparing a proposed form of judgment, subject to Defendants' objections. Presumably, the parties will amicably stipulate to facts concerning how particular reimbursements were in fact adjusted, and if not, the Court may appoint a special master for the purpose under Rule 53(a)(1)(C).

At the present time, however, Plaintiff has not shown commonality, because it is not clear how many doctors are alleged to have suffered which allegedly wrongful downcodings or bundlings via the automated ClaimCheck system.

### 3. Typicality

Plaintiff testifies that he has been a preferred provider with Defendants since 1999. (*See* Windisch Dep. 15:16–19, Feb. 10, 2011, ECF No. 87-4 to 87-5). He testified that he was personally subjected to the disputed bundling and downcoding practices. (*See id.* 66:21–67:8). This prong is also linked to the numerosity and commonality prongs. Plaintiff must show that the particular downcodings and bundlings suffered in common by a sufficiently numerous class were the same as those he himself suffered. He has not yet done this.

### 4. Adequacy of Representation

There is no indication of any collusion between Plaintiff and Defendants or any conflict of interest on the part of Plaintiff. The issues in the present case do not appear particularly difficult, and counsel note in a signed pleading that they have engaged in similar litigation against health insurance companies in federal court in the past leading to settlements.

## B. Rule 23(b)

Plaintiffs invoke Rule 23(b)(3). They must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. Rule Civ. P. 23(b)(3). The Court must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

The Court denies the motion under Rule 23(a), so it will not make a ruling under Rule 23(b) at this time. The Court will note that it tends to agree with the Eleventh Circuit's ruling in the similar case of *Klay v. Humana, Inc.* that Plaintiff would have to identify subclasses of doctors who were allegedly cheated under specific ClaimCheck algorithms in order for common

1   issues to predominate over individualized issues for any particular subset of doctors. 382 F.3d
2   1241, 1263–65 (11th Cir. 2004).  As noted, *supra*, Plaintiff has not done this.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Certify Class (ECF No. 87) and the Motions to Exclude (ECF Nos. 88, 100) are DENIED.

IT IS SO ORDERED.

Dated this 28th day of September, 2011.

_____
ROBERT C. JONES
United States District Judge